DUVELIUS *v.* SISTERS OF CHARITY OF CINCINNATI.

(Decided January 20, 1930.)

*Mr. James G. Stewart,* for plaintiff in error.
*Messrs. Dempsey & Dempsey* and *Messrs. Pogue, Hoffheimer & Pogue,* for defendant in error.

ROSS, J. This is a proceeding in error from the court of common pleas of Hamilton county wherein judgment was rendered for defendant, defendant in error in this court.

The petition alleges that the plaintiff, Helen Duvelius, while employed as a trained nurse in attendance upon a private patient occupying a room in the hospital operated by the defendant, had occasion, with the consent of the defendant, to use an elevator operated by an employee of the defendant, and was injured through the negligence of the operator, who was unskillful, incompetent, and unfit to operate such elevator, that said incompetency and unfitness and lack of skill were or should have been known by the defendant, and that she was thereby damaged.

The answer alleges that the defendant is a charitable corporation operating and maintaining a hospital, and that such hospital is not operated for profit.

The defendant admits that the plaintiff was acting, as alleged by plaintiff, with its consent, that the elevator was operated and controlled by an employee selected by it, and that the plaintiff was injured through the operation of said elevator. All other allegations of the petition were denied.

The second defense alleged contributory negligence.

The evidence developed that the plaintiff was employed by a private patient in the hospital, and that plaintiff was not an employee of the hospital; that she had occasion to use the elevator when going down to her evening meal; that the cab was started just as she had placed one foot in it; that she was thrown to the floor; that the cab was then caused to rise and her legs were crushed between the floor of the cab and the floor above.

We reproduce the following excerpts from the transcript of the evidence;

"(Witness, Mary Roell.)

"Q. What kind of a man was this elevator man? Describe him? A. He was an elderly man. I couldn't say his age. * * *

"(Helen Duvelius.)

"Q. What was the name of the man who was running the elevator at that time? A. Mr. Shroder.

"Q. Can you describe him to us? A. He was very nervous and excitable.

"Q. How with reference to his age? A. I judged him to be about 70 years of age.

"Q. State whether or not he was constantly running that elevator at the hospital? A. No. I think he only relieved—

"Q. What you observed? A. I used to see him when I come in on duty at night, he would be running the elevator.

"Q. That would be at what hour? A. 7 o'clock.

"Q. Did you see him doing anything else around that hospital? A. I saw him working down in the basement. He would be pulling trucks around. Ice trucks and things like that.

"(Witness, Florence Dunphey.)

"Q. Did you know Shroder, the elevator man there? A. Yes, sir.

"Q. Will you describe him to the jury, what kind of a man he was; his age and characteristics? A. He was a man about 65; between 65 and 70. He was of a very excitable disposition, and he showed that when the nurses would report for duty. He would take on 5 or 6 nurses and go half way up to a floor and come back down, and maybe 5 or more would get on and start up again. Often times he would not let us off at the floor we wanted to get off, and go

to the top floor and come down, and he didn't like the nurses.

"Q. What disposition did he show toward the nurses? A. When we would get on he would tell us, well, we should walk upstairs; and if we were going only one floor, 'Why don't you walk up?' I can't exactly remember but I know how he would talk to us.

"Q. Had he ever caught you in the elevator? A. I don't know how long it was before this accident he caught my apron as I was going on to the floor out of the elevator. He caught my apron in the door.

"Q. Was he a regular elevator man? A. No.

"Q. What did you see him do there mostly? A. I seen him on the dining room floor and the basement carrying ice and food and things like that.

"Q. What times would you see him on the elevator? A. He relieved the regular man from 5 to 5:30, the regular man, Mr. Dexter.

"Q. How long had he been there? A. I couldn't say. He was not there long.

"Q. A matter of years. A. No, it was not a matter of more than two months if I remember correctly.

"(Witness Florence Dunphey.)

"Q. Who was the regular elevator man? A. I think Dexter.

"Q. This man operated it from 7 to 8:30? A. I went on duty at 7, and I know the elevator man came on at 8:30.

"Q. Who operated the elevator between 7 and 8:30? A. Shroder did.

"Q. What sort of a looking man was Dexter? A. A gray-haired man.

"Q. What age was he? A. I couldn't tell you.

"Q. Was Shroder an older man or younger man than Dexter? A. Dexter was younger.

"Q. Mr. Dexter was a white-haired man? A. Gray hair.

"Q. You are very clear about that? A. He was not as white as Mr. Shroder.

"Q. You can't tell us any idea of Dexter's age? Was he 25? A. I said he was an elderly man. Any place from 45 to 55.

"Q. Was there any other man that operated this elevator besides these two? A. You mean at this time?

"Q. While you were there in training? A. When I entered there there was a one-armed young boy; and they had Joe Cooney running it once in a while. He was a half wit. He was relieved. He didn't know half the time what he was doing. They had a boy named Claud running the elevator. There may have been others."

At the conclusion of the plaintiff's evidence, the court instructed a verdict for the defendant.

Under the decisions of the Supreme Court of Ohio, a patient may not recover from a charitable organization, conducting a hospital, for injuries received through the negligence of its employees, unless it be proved that the managers of the organization have failed to exercise due care in the selection of such employees. *Taylor* v. *Flower Deaconess Home & Hospital,* 104 Ohio St., 61, 135 N. E., 287, 23 A. L. R., 900; *Rudy* v. *Lakeside Hospital,* 115 Ohio St., 539, 155 N. E., 126.

There is no binding authority in this state applying such limitation upon the rule of *respondeat*

*superior* to a case where the person injured is not a patient, but on the contrary is an invitee, such as was the plaintiff in the instant case.

However, construing the rule applicable to patients as binding upon invitees, the action of the court in the instant case in instructing a verdict in the face of the evidence, particularly that quoted, constitutes error, requiring a reversal.

It is urged that the evidence presented no question for the jury under the present law of this state. It is our conviction, and we so hold, that the evidence did present the questions for the jury: Whether the management knew, or should have known, that the operator was unfit, incompetent, and unskillful; whether such management exercised the care which a reasonably prudent person would exercise under similar circumstances in the selection of such employee, and in continuing to permit said employee to operate an elevator such as that involved in the instant case; and whether, if the failure to exercise such care existed, the injuries complained of were the proximate result of such negligence.

The case should have been submitted to the jury under a charge similar to that approved by the Supreme Court in the case of *Taylor* v. *Flower Deaconess Home & Hospital, supra.*

The judgment will be reversed and the cause remanded for a new trial.

*Judgment reversed and cause remanded.*

CUSHING, P. J., and HAMILTON, J., concur.